IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MATTHEW DRAPKIN AND NICOLE DRAPKIN SCHAFFER, AS EXECUTORS OF THE ESTATE OF DONALD G. DRAPKIN, )<br><br>Plaintiff, )<br><br>v. )<br><br>ADNAN M. M. MJALLI, )<br><br>Defendant. ) | 1:19-CV-175 |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge

Plaintiff, the Estate of Donald G. Drapkin ("Drapkin"), brings this action to enforce a promissory note ("the Note") on behalf of the Estate. (ECF No. 1.) Before the Court is Plaintiff's Motion for Summary Judgment. (ECF No. 45.) For the reasons stated below, Plaintiff's motion will be granted.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

Prior to his death in 2016, Drapkin "was a successful businessman." (ECF No. 46-2 ¶¶ 2, 8.) He was also a longtime friend and business associate of Defendant, Adnan M. M. Mjalli. (*See, e.g.*, ECF No. 46-4 at 3–4.) During the summer of 2008, Drapkin wired Defendant one million dollars through two separate transfers, one for $600,000 on June 26, the other for $400,000 on September 11. (ECF No. 46-2 ¶¶ 10–11.) On September 10, 2008, the day before the second transfer, Defendant executed a promissory note reading in full:

1

> For VALUE RECEIVED, the undersigned promises to pay Donald G. Drapkin the principal sum of ONE MILLION DOLLARS ($1,000000.00) with interest at the lowest applicable federal rate. The said principal and interest shall be payable in lawful money of the United States of America on September 10, 2018.

(*Id.* at 16.) When the Note came due, approximately two years following Drapkin's death, Plaintiff demanded the million dollars from Defendant, which Defendant refused to pay. (ECF Nos. 1 ¶¶ 12–13; 44 at 3.)

On February 14, 2019, Plaintiff initiated this lawsuit against Defendant seeking repayment of the Note of one million dollars plus interest. (ECF No. 1 ¶ 24.) On February 20, 2020, this Court, in addition to denying Plaintiff's Motion for Judgment on the Pleadings, granted in part and denied in part Defendant's Motion for Leave to Amend Answer and File Counterclaims. (ECF No. 43 at 1.) On February 26, 2020, Defendant filed an Amended Answer and Counterclaim asserting two affirmative defenses to Plaintiff's contract claim: (1) that Defendant was never indebted to Drapkin because the money was a gift and (2) that to the extent Drapkin did loan Defendant money, Drapkin waived his right to repayment.[1] (*See* ECF No. 44 at 5.) Defendant also asserted a counterclaim seeking a declaratory judgment that the sums transferred to Defendant in 2008 were gifts, not a loan, and "that [Defendant] is not indebted to Plaintiff for any other amount." (*Id.* at 14–15.) Plaintiff now moves for summary judgment. (ECF No. 45.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

---

[1] The Court will refer to these defenses as Defendant's "gift defense" and his "waiver defense."

2

court must view the evidence and "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

In opposing a properly supported motion for summary judgment, the nonmoving party cannot rest on "mere allegations or denials," *id.* at 248 (internal quotation omitted), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must support its assertions by citing to particular parts of the record or by showing that the materials cited by the moving party do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III. DISCUSSION

Under North Carolina law, in an action on a promissory note, the introduction of the note along with evidence of execution and delivery is sufficient to make out a prima facie case for the entire amount of the note. *In re Cooke*, 246 S.E.2d 801, 804 (N.C. Ct. App. 1978). Here, Defendant admits that he received one million dollars from Drapkin, that he signed the Note promising to repay the loan with interest, and that he refused to pay after the Note matured. (ECF Nos. 1-4; 44 at 2–3.) Nevertheless, Defendant claims that he is not liable on

3

the Note because "the one million dollars was a gift," not a loan. (*See* ECF No. 48 at 19.) To prevail on its motion for summary judgment, Plaintiff must therefore show that there is no genuine dispute as to the nature of the Note. As set forth below, Plaintiff has come forward with powerful evidence establishing that the Note was a loan, while Defendant has produced little, if any, evidence showing that the Note was a gift. Accordingly, for the reasons outlined below, there is no genuine dispute as to any material fact and Plaintiff is entitled to judgment as a matter of law.[2]

### A. Elements of an Inter Vivos Gift

In North Carolina, "[t]he essential elements of a gift *inter vivos* are 1) donative intent and 2) delivery, actual or constructive." *Holloway v. Wachovia Bank & Tr. Co., N.A.*, 423 S.E.2d 752, 755 (N.C. 1992). The intent to give a gift must be "clear and unmistakable." *See McLean v. McLean*, 374 S.E.2d 376, 381 (N.C. 1988). To determine if this intent is present, courts look to "the relation of the parties and . . . all the facts and circumstances." *See id.* Generally, the "most relevant" evidence of donative intent is the testimony of the donor. *Burnett v. Burnett*, 471 S.E.2d 649, 651 (N.C. Ct. App. 1996). Courts also consider "the testimony of the alleged donee, [any] documents surrounding the transaction, whether a gift tax return was filed, and whether an excise tax was paid." *Id.*

---

[2] In its brief in support of summary judgment, Plaintiff argued that Defendant's waiver defense failed because "there is no evidence of any acts or conduct by Mr. Drapkin that would constitute a waiver." (ECF No. 46 at 7.) Defendant did not respond to this argument or address his waiver defense in any fashion in his response brief. (*See* ECF No. 48.) The Court therefore finds that Defendant has abandoned his waiver defense. *See Modern Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 529, 546 (M.D.N.C. 2019) ("Typically, 'a party's failure to address an issue in its opposition brief concedes the issue.'" (quoting *Oliver v. Baity*, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016))).

### B. Evidence of Drapkin's Donative Intent

In this case, Drapkin died before the Note came due and thus is unavailable to testify to his intent. However, Drapkin did leave behind one clear expression of intent in the form of the Note itself, which unambiguously states that Defendant was to repay Drapkin with interest on September 10, 2018. (ECF No. 46-2 at 16.) Defendant has identified no admissible evidence directly refuting this evidence.[3] In addition to the Note being strong documentary evidence that Drapkin intended the transfer to be a loan, Plaintiff produced evidence that Drapkin did not file a gift tax return on the transfer. (ECF No. 46-9 ¶ 5.) As Drapkin likely would have been required to file such a return had this transfer been a gift, his failure to file likewise supports Plaintiff's position that the transfer was, in fact, a loan. *See* 26 U.S.C. §§ 2501(a), 2502(c), 6019; *see also, e.g.*, *United States v. Davenport*, 327 F. Supp. 2d 725, 729 (S.D. Tex. 2004) ("Under the Internal Revenue Code, a transfer of property by gift in any calendar year is subject to tax for that calendar year. The donor of the gift must file a gift tax return and pay the gift tax on all taxable gifts made in that year." (internal citation omitted)).

In the face of this powerful evidence that Drapkin intended to loan money to Defendant, Defendant offers many arguments, but no persuasive evidence, to support his contention that the Note was a "sham" and that Drapkin really intended to gift to Defendant the million dollars. (*See* ECF No. 48 at 19–22.)

---

[3] While Defendant alleges that Drapkin told him over the phone on September 10, 2008 that the Note was simply to "paper" the gifts and that "on [Drapkin's] children's lives, [the Note] w[ould] never see the light of day," (*see* ECF No. 44 at 11), the parties now agree that North Carolina's dead man's rule bars the Court from considering Defendant's testimony regarding any oral communications he had with Drapkin concerning the Note, (*see* ECF Nos. 46 at 18–21; 48 at 2 n.1). Furthermore, Defendant has not produced any evidence from a third-party corroborating Drapkin's alleged statements on September 10. The only other person to hear their phone call that day—Defendant's executive assistant, Maria Gonzalez—does not recall the conversation at all. (*See* ECF Nos. 46-2 ¶ 13; 46-6 at 7–8.)

5

Defendant primarily argues that the Court should infer a gift from the fact that Drapkin and Defendant were "close personal friends with a history of mutual generosity." (*See id.* at 19–20.) The undisputed evidence in the record does establish that the two men were friends. (ECF No. 46-4 at 3.) Further, it is undisputed that the two gave each other gifts. For example, Defendant, an expert in pharmaceuticals, states that he "spent hundreds of hours of uncompensated time" over the years advising Drapkin on investments in pharmaceuticals. (ECF No. 49 ¶ 16.) Drapkin was likewise generous with Defendant. The record establishes that Drapkin would fly Defendant to New York on his plane, gave Defendant an expensive watch, and had his charity donate money to Defendant's charity. (*See id.* ¶ 13; ECF No. 50-4 at 5.) There is no evidence that these gifts were encumbered by promissory notes or other legal documents. (*See, e.g.*, ECF No. 46-3 at 10.) Thus, this evidence weighs against a finding of donative intent, as it shows that when Drapkin made actual gifts to Defendant, such gifts were unencumbered.[4]

Defendant's gift defense is further undermined by evidence Defendant introduces regarding a 2005 loan Drapkin made to Defendant. In 2005, Drapkin loaned Defendant $200,000. (ECF Nos. 49 ¶ 20; 49-1 at 2–3.) To secure the loan, Defendant put up 100,000 shares of TransTech Pharma, Inc. ("TransTech"), a company Defendant started and in which Drapkin's employer, MacAndrews & Forbes, had invested. (ECF Nos. 49 ¶¶ 3–5; 49-1 at 1.) Drapkin and Defendant documented the 2005 loan in a two-page secured promissory note

---

[4] Defendant also appears to argue that all loans among close friends should be strictly scrutinized by courts to ensure that they are not actually gifts. (*See* ECF No. 48 at 17–18.) It is true, as Defendant argues, that "loans from close family members must be closely scrutinized for legitimacy" in equitable distribution cases concerning the division of marital debts. (*See id.* at 17 (citing *Geer v. Geer*, 353 S.E.2d 427, 430 (N.C. Ct. App. 1987)).) Defendant, however, provides no authority supporting his proposition that "[p]ersonal 'loans' between close friends—outside of the commercial context— deserve the same scrutiny." (*See id.* at 18.)

6

that was considerably more formal than the two sentence note they agreed to in 2008. (*Compare* ECF No. 46-2 at 16, *with* 49-1 at 2–3.) Defendant argues that the relative formality of the 2005 note somehow suggests that the less formal 2008 note must have been a gift. (*See* ECF No. 48 at 13, 21.) This contention rests on a false equivalence between the two loans. The 2005 note was more formal in large part because it was secured by a stock pledge that required the sign-off of Ronald Perelman ("Perelman"), the majority owner of TransTech and the head of MacAndrews & Forbes. (*See* ECF No. 49-1 at 1, 13; 50-3 at 7.) The 2008 note, by contrast, was an unsecured agreement between the two friends that required no permission from a third party. The Court therefore finds that to the extent the 2005 loan is relevant to the question of donative intent, it is detrimental to Defendant's case as it highlights that Drapkin had (1) loaned money to Defendant before, (2) formalized the loan with a promissory note, and (3) expected the note to be repaid.[5]

Next, Defendant argues that the note must have been a gift and not a loan because he "did not need a million dollar 'loan' [and] had sufficient funds available to repay any 'loan.'" (ECF No. 48 at 22.) This argument presupposes that those with money never take out loans, a tenuous proposition. In fact, given the highly favorable terms of the Note—low interest rate, advanced maturity date, no scheduled repayments—Defendant could very well have profited from the Note, even if he did not "need" it.[6] (*See* ECF Nos. 46-2 at 16; 48 at 20.) This argument is also contradicted by evidence in the record, which establishes that Defendant

---

[5] The 2005 note was ultimately repaid, though only after the parties extended the note's maturity date by three years. (*See* ECF Nos. 48-3 at 22; 49-1 at 2; 49-2 at 3.)

[6] Defendant latches on to these favorable terms, arguing (without any supportive citations) that the Court should infer donative intent because the Note contained borrower-friendly provisions. (*See* ECF No. 48 at 20.) The Court disagrees: favorable *loan* terms tend to show the existence of a loan, not a gift.

7

received a four and a half million-dollar loan from TransTech in 2008, was regularly in need of "personal monies," and needed a three-year extension to pay back the 2005 loan. (*See* ECF Nos. 49-2 at 2–3; 50-3 at 5–6; 50-4 at 4.) Accordingly, the Court cannot glean donative intent on Drapkin's part from Defendant's assertions that he did not need a loan and could have repaid any loan he received.

Defendant also maintains that Drapkin's treatment of the Note indicates that it was really a gift. (ECF No. 48 at 21–22.) Defendant states that "there is no evidence that the alleged 'loan' was ever discussed by *anyone* from mid-2008 to [Drapkin's] death." (*Id.* at 21.) Defendant does not, however, adequately explain why this silence would tend to show that the transfer was a gift rather than a loan. Nor does the record support Defendant's assertion of Drapkin's alleged silence regarding the transfer. Drapkin's son, Matthew, has testified that he learned prior to his father's death that Defendant owed his father "a substantial amount of money." (*See* ECF No. 50-2 at 6.) Further, Defendant asserts that "[t]here is . . . no evidence that Mr. Drapkin ever treated the loan as an asset during his lifetime." (ECF No. 48 at 21–22.) Defendant has not, however, explained why or how Plaintiff should have done so, given that Defendant did not repay any principal or interest on the transfer. (*See* ECF No. 46-9 ¶ 5.)

Nor do Defendant's two remaining arguments raise a genuine issue as to Drapkin's donative intent. Defendant draws the Court's attention to what he calls the "unusual" timing of the transfers, whereby Drapkin wired $600,000 to Defendant in June, the parties signed the Note on September 10, and Drapkin wired the remaining $400,000 the following day. (*See* ECF No. 48 at 20.) The Court does not see, and Defendant has not explained, why, in light of the Note, this allegedly unusual timing shows donative intent. Furthermore, the record

8

supplies a perfectly plausible explanation for this supposedly unusual sequence of events—
Drapkin and Defendant were friends, and Drapkin had a history of loaning money to
Defendant on terms favorable to Defendant. It is therefore not at all unreasonable to think
that Drapkin might have advanced money to Defendant before the two formalized their
arrangement. Finally, Defendant falls back on his own assertions that the transfers were gifts,
not loans. (*Id.* at 20, 22.) While North Carolina law does recognize that a donee's testimony
is relevant to the question of donative intent, *Burnett*, 471 S.E.2d at 651, Defendant's assertion
is strongly contradicted by the evidence in the record and therefore fails to create a genuine
issue of material fact from which a jury could find that the money transferred to him was a
gift rather than a loan.

In conclusion, Plaintiff has produced uncontested evidence that Defendant (1) signed
a promissory note promising to repay a loan, (2) received the loan, and (3) refused to repay it.
Further, Plaintiff has produced strong evidence that the Note was indeed a loan and not a gift.
Defendant's evidence to the contrary fails to establish a genuine issue of material fact as to the
nature of the Note. Accordingly, Plaintiff is entitled to judgment as a matter of law.[7]

### C. Interest Rate

Having determined that the Estate is entitled to recoup the principal of Drapkin's loan,
the Court must also determine the interest rate at which Defendant must repay the loan. The
Note itself calls for repayment at "the lowest applicable federal rate." (ECF No. 46-2 at 16.)
Defendant argues that this term is ambiguous, citing only to a portion of Matthew Drapkin's
deposition in which Matthew characterized the term as "open to interpretation." (ECF Nos.

---

[7] Because the Court so concludes, it need not address Defendant's renewed argument that North
Carolina's parol evidence rule prohibits the introduction of evidence showing that a loan is really a
gift. (*See* ECF No. 46 at 21–24.)

9

48 at 20; 48-1 at 9.) However, whether a term in a contract is ambiguous is a question of law, *see Salvaggio v. New Breed Transfer Corp.*, 564 S.E.2d 641, 643 (N.C. Ct. App. 2002), and it is therefore the Court's obligation to determine if this term is ambiguous.

26 U.S.C. § 7872(f)(2)(A), which governs loans with below-market interest rates, defines "the applicable Federal rate" as "the applicable Federal rate in effect under [26 U.S.C. § 1274(d)] (as of the day on which the loan was made), compounded semiannually." 26 U.S.C. § 7872(f)(2)(A). In turn, § 1274(d) establishes that for loans with a term over nine years, the applicable Federal rate is the "Federal long-term rate." *Id.* § 1274(d). Accordingly, the lowest applicable Federal interest rate for this loan, which had a term of ten years, is the Federal long-term, semiannual rate on September 10, 2008, the day the loan was made. That rate was 4.53 percent. IRS Rev. Rul. 2008-46 Table 1, *available at* https://www.irs.gov/pub/irs-drop/rr-08-46.pdf. The Court therefore concludes that there is no genuine issue of material fact as to the rate at which Defendant must repay Plaintiff.

The Court therefore enters the following:

## ORDER

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment, (ECF No. 45), is GRANTED.

IT IS FURTHER ORDERED that Defendant shall pay Plaintiff $1,000,000.00 plus interest accruing at 4.53 percent compounded semiannually beginning September 10, 2008 until Plaintiff is paid in full. A Judgment will be filed simultaneously with this Order.

This, the 26th day of May 2020.

/s/Loretta C. Biggs
United States District Judge